*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RANDALL LEE NEWMAN II,

        Defendant-Appellant.

UNPUBLISHED
October 24, 2024
2:51 PM

No. 358446
Cheboygan Circuit Court
LC No. 20-005914-FC

Before: PATEL, P.J., and SWARTZLE and HOOD, JJ.

PER CURIAM.

A jury convicted defendant of two counts of first-degree criminal sexual conduct (CSC), MCL 750.520b. Both convictions relate to defendant's sexual assault of his young biological daughter. On appeal, defendant raises several claims challenging his convictions. Most of the claims are without merit, though it is clear that defense counsel performed objectively unreasonable in several ways. As explained, however, defense counsel's deficient performance did not prejudice the defense such that, in the absence of counsel's errors, it is reasonably probable that the jury trial would have turned out differently. Therefore, we affirm both convictions. Defendant is correct that his consecutive sentences must be vacated, however, so we remand to the circuit court solely for resentencing.

## I. BACKGROUND

Shortly after his arrest, it appears that defendant removed his first attorney. Ronald Varga then took over as defense counsel and represented defendant during the preliminary examination, which was held on January 23, 2020. The victim, who was six years old at the time of the preliminary examination, testified that she had previously lived with defendant and her mother, sister, and brother. The victim testified that defendant "stuck his penis in [their] butt[s]," referring to herself and her siblings, more than one time. Further, defendant put his penis in their mouths "[o]nce or twice." The victim thought that the assaults occurred "in the evening" before she went to sleep.

Varga asked the victim on cross-examination whether she had ever spoken with anyone else about defendant touching her. The victim replied that she had spoken with her foster parents

-1-

and some family members about the allegations. The victim stated that her foster mother "told [her] to tell" about defendant anally penetrating her, and the victim had practiced what she would say in court with her foster mother while her foster mother did her hair. The victim's foster mother had also talked with her about telling the truth, and the victim stated that she had told the truth that day. The victim explained that sometimes she told lies to avoid trouble, but she did not "lie about like the back then things. . . like about [defendant]." She also testified that she had a "terrible memory." Defense counsel conceded that there was "a question of fact" about the two counts of first-degree CSC, and the district court bound defendant over on those charges.

The circuit court subsequently postponed defendant's original trial date, set for April 7, 2020, because of the COVID-19 emergency. Defense counsel indicated at that time that defendant was "unhappy" about the adjournment, but understood that it was out of anyone's control. There were additional adjournments as a result of administrative orders that limited the number of people who were allowed in the courtroom. Defendant asserted his right to a speedy trial several times, but agreed to some postponements. Defendant then sought, and obtained, new counsel in July 2020. Defendant acknowledged that he understood appointing new counsel would result in additional delays.

The prosecutor filed an other-acts notice in October 2020, stating that she intended to offer evidence under MCL 768.27a that defendant had also sexually assaulted the victim's siblings. The prosecutor explained that the information came from the victim's testimony at the preliminary hearing and police reports, of which defendant had possession.

During a September 2020 status conference, the circuit court noted that defendant had been discharged from prison in Montana to Genesee County, where defendant had been sentenced in another case to prison. Thomas Hungerford, defendant's new attorney, asserted that he planned "to have somebody that's an expert look at the forensic exam." Defendant then moved for medical examinations of the victim and her siblings, and a psychological examination of the victim, on the grounds that "[t]he victim's age at the time of the alleged incident may go to the truthfulness of her testimony"; the victim's allegations included "[m]ultiple stories"; there was a lack of medical evidence; and the incident occurred over three years before the preliminary examination, which could affect the truthfulness of the allegations.

At a hearing on the motion, Hungerford explained that he wanted a child psychologist to meet with the victim and testify about "the cognitive ability of certain children that age and the effect of time, what it does to one's memory." He noted that the victim "may in fact be subject to some type of . . .coercion." Hungerford stated that he wanted "testimony on the defendant's behalf in which someone can guide us along on what is the case. Well, how does time affect memory, especially of a young child this particular age. . . I think it's crucial to our case." The circuit court denied defendant's motion, observing that defense counsel sought "rather remarkable relief . . . to order a witness to be subjected to intrusive examinations, medically and psychologically." The circuit court stated that "the defense [was] free to engage a psychologist as an expert witness to testify about" age and memory, without examination of the victim.

During the same hearing, defendant told the circuit court that he was having trouble hearing. Defendant explained that he had recently been "diagnosed with a 75% hearing loss in [his] left ear" that made it difficult for him to hear and understand what was being said during the

virtual proceedings. Defendant did not request any accommodations, although when questioning a witness at the same hearing, Hungerford asked the witness "to speak up a little bit," for the benefit of Hungerford and defendant, who "ha[d] some difficulty hearing."

At a January 2021 hearing, Hungerford informed the circuit court that he was waiting for the Michigan Indigent Defense Commission to respond to his request for a child psychologist to testify in the case. The circuit court raised dates in March and April for trial, and defendant argued that the circuit court was going to violate the 180-day rule if the trial was not held before February 2021. The circuit court noted that there was good cause for the adjournment on the basis of the pandemic.

During an April 2021 hearing, the circuit court denied defendant's request to represent himself. The prosecutor also moved the circuit court to strike defendant's witness list on the basis that she wanted the defense to specifically name the child psychologist he wanted to testify, so that she could prepare for trial. Hungerford stated that he was considering two psychologists and would tell the prosecutor as soon as he knew which one would testify. The circuit court ordered the defense to list the expert witness within 14 days. When given the option of keeping a May trial date, or postponing until July, the defense requested the latter date.

During a June 2021 motion hearing, done over Zoom, Hungerford told the circuit court that defendant had told him multiple times that defendant had "hearing issues." When the circuit court stated that it would "speak more loudly" than usual, defendant explained, "It's not that. It's just some kind of lag between the thing, so it's making everything sound funny." The circuit court told defendant to tell them if anything needed to be repeated, and defendant said, "Uh-huh."

Defendant's trial started on July 20, 2021, and defendant was physically present in the courtroom for the trial. Both Hungerford and Varga were present to represent defendant. During his opening statement, Hungerford told the jury that the evidence would show that the victim made "really inconsistent statements" about herself and her siblings, and that the victim had been coached.

Outside of the presence of the jury, the parties then discussed the arrangements for the victim to testify from another room over video conferencing, as a result of an earlier motion by the prosecutor for witness accommodations. The prosecutor and Hungerford would be with the victim, while defendant and Varga would be in the courtroom with the judge, court staff, and jurors, who would be able to see the victim on a large video display. Defendant renewed his objection to the arrangement. The circuit court overruled the objection, but did explain that the two defense attorneys would have a chance to meet after the prosecutor's direct examination and following cross-examination to discuss any additional questions.

The victim, eight years old at the time of trial, testified that defendant orally and anally penetrated her, and she witnessed defendant do the same to her siblings. On cross-examination, the victim admitted that she had told "[a] lot" of lies, but she maintained that none were related to the present case. The victim also stated that she did not have a good memory. Hungerford asked her if she remembered her testimony from the preliminary examination, including if she remembered her foster mother telling the victim to say that defendant "stuck his penis in [her] butt?" The victim did not remember her previous testimony, but stated that her foster mother had

talked with her about the preliminary examination the day before trial. The victim stated, "Like, Momma told me last time, I would tell them about the stuff." Hungerford asked the victim if her foster mother told her what to say. The victim denied practicing her testimony for trial, but stated that her foster mother "told [her] some stuff." The victim stated that she had difficulty remembering what happened "like a year ago or long time ago" as well as things that related to her biological parents. The victim stated that she was telling the truth about defendant assaulting her and her siblings.

With respect to her cross-examination, the victim had difficulty understanding many of defense counsel's questions, likely because of her young age at trial. The circuit court had to dismiss the jury several times, and the court allowed the two defense attorneys to consult during the cross-examination. The circuit court also admonished Hungerford for repeatedly asking about defendant merely "touching" the victim, when she had testified that he actually penetrated her with his penis. Hungerford suggested that Varga continue the questioning, and the circuit court stated that Hungerford was not incapable of continuing the questioning.

Dr. Luann Labian testified for the prosecution as an expert witness in pediatric medicine. Dr. Labian observed that, in general, it was "[u]sual" for a victim to delay reporting sexual abuse and that there was "usually not" a physical injury from a sexual assault because "kids heal really quickly."

With respect to this case, Dr. Labian explained that she first met the victim when her foster mother brought her in for a consultation because of some unusual behaviors, including sexual and self-injurious behaviors. The victim was four years old at the time and "very verbal." Dr. Labian stated that she had been practicing medicine "for a long time and this was a very upsetting appointment." Dr. Labian had been speaking with the foster mother while the victim played on a rug, when, all of a sudden, the victim "began to act out every sexual position you could possibly imagine." The victim acted out explicit sexual positions and said things like "Sometimes he sat on me and did this," while acting out a humping motion. The victim stated that defendant urinated in her hair and that she "need[ed] to know how to do this because that's what [she was going to] have to do someday." The victim stated that defendant told her "to open [her] mouth like [she] was eating a big strawberry and he was putting his penis in it." A video of some of the victim's visit to Dr. Labian was played for the jury.

Carly Bentley, the forensic interviewer, testified, describing the process for an interview with a child, including building rapport, talking about telling the truth, and using open-ended questions. Bentley testified that it can take more than one interview for a child to feel comfortable enough to make disclosures. Bentley had interviewed the victim in May and October 2018. The prosecutor asked Bentley if there were "any signs of suggestibility or coaching of [the victim] prior to getting to you for the interview?" Bentley answered, "Not that I recall, no." Defense counsel did not cross-examine Bentley.

The prosecutor also offered the testimony of several additional witnesses, including law enforcement officers. Trooper Michael Pionk testified that he had received a complaint involving defendant and the victim in December 2017. That investigation was closed after the victim failed to make allegations during an interview. In the interview, the victim stated that she liked defendant

and had fun visiting him. Trooper Pionk acknowledged that the victim, in her trial testimony, had "added" to the information she gave in her initial interview.

Law enforcement received another complaint in May 2018, at which point the victim was again interviewed. Trooper Pionk interviewed defendant in June 2018, and defendant described the victim as "a very honest child." Soon after Trooper Pionk interviewed defendant and the children's mother, Jessica Newman, defendant and Newman left Michigan. Eventually officers located them in Montana.

Detective Sergeant Robert Scott, of the Michigan State Police, testified that, during his interview with defendant in June 2018 about the sexual-assault allegations, defendant explained that the family had been staying in a camper, and the victim slept on a bed that was in the kitchen area, under some cabinets. Defendant reported in his interview that there had been a night in which he woke up hungry and gone to the cabinet. Defendant had to step over the victim and straddle her, putting one knee on each side of her, to reach the cabinet. Defendant explained to Detective Sergeant Scott that he was wearing boxer shorts that did "not have a button on the fly, so they were wide open." Defendant thought that it was possible that his erect penis "could have came out the fly of his boxers and [the victim] would have saw that at that time."

Defendant testified on his own behalf, refuting the victim's testimony of abuse as untrue. Referring to Detective Scott's testimony, defendant explained that one night, he woke up hungry, so he went to the kitchen and put his knee on the table so that he could reach into the cupboard, but he had been fully clothed.

Defendant did not know how the victim became knowledgeable about sex, and he testified that he and Newman did "[n]ot knowingly" have sex in front the victim, but they had been living in a camper, and it was possible that the children had woken up in the night. Defendant further testified that "unless [he] absolutely had to, [he] would not change any of [his] daughter's diapers," although he would change and bathe his son. Defendant did not "feel that [he] should see [his] daughter like that, period, ever." When the prosecutor asked defendant about this stance and whether he feared that he would "do something," defendant answered, "No, it's just, in my opinion, a father should not see his daughter in the nude, period, ever."

Notably, during his testimony, defendant did not request any hearing accommodation and was able to testify while answering questions from his counsel and the prosecutor.

After the close of proofs, the circuit court instructed the jury, including that flight could be considered as evidence of guilt. The jury deliberated and convicted defendant of two counts of first-degree CSC. The circuit court later sentenced defendant to two consecutive terms of 35 years and seven months to 60 years in prison, finding that consecutive sentencing was appropriate because the victim's statements indicated that the incidents of anal and oral penetration occurred as part of the same sexual assault.

Defendant appealed and moved for remand, arguing that he received ineffective assistance of counsel when trial counsel failed to consult with an expert on child memory, suggestibility, and

forensic interviewing. This Court remanded the case to the circuit court for a *Ginther*[1] hearing on the issue. *People v Newman*, unpublished order of the Court of Appeals, entered March 15, 2023 (Docket No. 358446).

At the *Ginther* hearing, Hungerford testified that the defense strategy was to attack the victim's memory and to argue that the victim was coached. Hungerford had hoped to show evidence of the victim's inconsistent statements and coaching through witness testimony, including that of the victim. Hungerford stated that he had gotten some of the information from the victim during cross-examination, but he had not been able to ask all of the questions that he wanted. The victim had, however, admitted that she had difficulty remembering things, and Hungerford had specifically asked her about her preliminary-examination testimony including about her foster mother telling her to report some information and that the victim admitted at the preliminary examination that she had practiced her answers. Hungerford stated that he had never before questioned a witness as young as the victim, but he had been able to consult with co-counsel during breaks in the questioning.

Hungerford had not seen any forensic interviews of the victim and did not ask for any interviews. Hungerford stated that he had worked on "probably two" other CSC cases before, although he had done 20 to 30 other criminal trials in addition to civil trials. Hungerford only took this case with Varga's agreement that they would serve as co-counsel. Hungerford did not consult with an expert, but he moved for an expert to interview the child because Hungerford had concerns that people had been speaking with the victim about the case. The circuit court, however, denied Hungerford's motion. To prepare for trial, Hungerford reviewed the file, including witness statements, and discussed defendant's potential testimony with him. Hungerford also reached out to his sister, a prosecutor in another county, to discuss trial strategy.

For his part, Varga testified that, although now retired, he had been an attorney for 40 years, primarily in criminal law, and he did approximately 10 to 15 trials a year. He recalled that defendant was a "relatively difficult client" and that defendant seemed more comfortable with Hungerford. Defendant had refused to meet with Varga at least one or two times when Varga tried to see him at the jail. Varga had taken over the case for another attorney, whom defendant had fired, and then defendant fired Varga. Hungerford was then assigned to the case, with Varga assigned to sit second chair at trial. Varga did not know about the forensic interviews and did not contact any expert, although he did not always call expert witnesses for trials. Varga stated that one of the issues at trial was that Hungerford had "a very difficult time cross-examining the young witness." Varga considered stepping in, but he determined it would be a "bad move" because it might reduce Hungerford's credibility with the jury. Varga consulted with Hungerford during at least one break in the questioning of the victim.

Dr. Daniel Swerdlow-Freed, who has a Ph.D in clinical psychology, also testified during the *Ginther* hearing. He was deemed by the circuit court to be "an expert in the areas of forensic interviewing of children as well as in child memory and susceptibility." Dr. Swerdlow-Freed explained that, during a forensic interview, there are best practices that lead to a greater chance of

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

receiving accurate replies, and he had reviewed the victim's initial allegations and records of two forensic interviews, both of which were performed by the same person.

Dr. Swerdlow-Freed took issue with the interviewer's failure to do practice narratives on a neutral subject to get the victim accustomed to the interview process and failure to always ask open-ended questions and get clarification on answers. Dr. Swerdlow-Freed noted, for example, that the victim's statement that defendant's pee "tasted like glass in her mouth" was confusing because it was not describing a taste, but was, instead, "nonsense," and required clarification.[2] Dr. Swerdlow-Freed also stated that it was unusual, because of her young age, that the victim reported not feeling pain from the penetration. Dr. Swerdlow-Freed had not reviewed the trial transcripts, and he admitted that children do not always disclose trauma in a chronological or clear pattern. Dr. Swerdlow-Freed also acknowledged that contradictions in the victim's statements could mean that she was abused more than one time.

Dr. Swerdlow-Freed explained that young children are especially susceptible to problems with "source monitoring" (i.e., identifying the source of their information) and are, therefore, vulnerable to making mistakes. Children are, for example, generally more suggestible than adults, meaning that they incorporate information "that does not accurately reflect what they have experienced." Children can learn about age-inappropriate sexual information by seeing others acting in a sexual manner or from television, and information they receive from adults can impact their memories of an event.

After hearing all of the testimony during the *Ginther* hearing, the circuit court ruled that Hungerford's cross-examination of the victim was not objectively unreasonable because he specifically referred to preliminary-examination testimony and elicited evidence of coaching. Further, the defense did not establish the prejudice prong. Next, the circuit court found that it was not necessary for a defense attorney to call an expert witness in every child-sexual-abuse case. The circuit court distinguished this case from the situation in *In re Casto*, 344 Mich App 590; 2 NW3d 102 (2022), where there were significant "red flags" of coaching.

The circuit court also found that while it was objectively unreasonable not to watch the forensic interviews, defendant had not established that he was prejudiced from this. The circuit

---

[2] The victim did not actually tell the interviewer that defendant's urine "tasted" like glass. Rather, the following exchange took place between the interviewer and victim during the first forensic interview:

> *Q*. What did [defendant's] pee taste like?
>
> *A*. It's nasty stuff.
>
> *Q*. Nasty stuff? What did it *feel* like in your mouth?
>
> *A*. It *felt* like it was glass breaking. [(emphasis added).]

court found that the critique of the interviews was measured; the forensic interviews themselves were inadmissible; the victim's statements to Dr. Labian were admissible and admitted at trial; defendant's flight was evidence of guilt; and defendant's statement about his penis falling out of his boxer shorts was a "ridiculous" explanation for the allegations. The circuit court found that consulting with Dr. Swerdlow-Freed, or having him testify at trial, would not have made a different outcome reasonably probable. Therefore, the circuit court found that defendant was not entitled to a new trial on the basis of ineffective assistance of counsel.

Defendant subsequently moved this Court for remand on the basis that the prosecutor failed to turn over the forensic interviews, constituting a *Brady*[3] violation. This Court entered an order for an evidentiary hearing on the matter. *People v Newman*, unpublished order of the Court of Appeals, entered November 21, 2023 (Docket No. 358446).

During the *Brady* hearing on remand, Varga testified that he did not remember receiving a flash drive, did not watch any videos, and gave Hungerford "the complete file." Hungerford testified that he had received discovery materials from Varga and the public defender's office. The materials came in paper form, and Hungerford looked through all of the papers. Hungerford did not think that he received a thumb drive or a video.

Gina Borino, who worked for the Cheboygan Public Defender's office, testified that the discovery materials for defendant's case "came on a thumb drive." Borino explained that when she received it, she would also have received a sheet telling her what was included, and she would have compared the two to ensure she had received everything. Defendant's discovery materials included videos of interviews.

Juliet Rettell, a legal secretary for the Cheboygan County Prosecutor's Office, testified that she remembered sending the discovery in defendant's case because "there was a lot of it, so [she] had to put it on a thumb drive." Rettell testified that she knew there was at least one video included, but she thought that there were two. Retell remembered seeing a little girl on a playmat with a map. Retell testified that she had been "very careful about what [she] put on [the thumb drive] and made sure that everything was on it." Rettell prepared the list of items that she gave to Borino along with the thumb drive.

The prosecutor included with its response to defendant's motion for a new trial the discovery list, including a list of five discs that held various numbers of items. Further, the prosecutor attached documentation showing that the items on the discs included the May and October forensic interviews. The circuit court found that Borino's and Rettell's testimony established that the defense received the discovery. Accordingly, the circuit court concluded that defendant had failed to establish that the evidence was not provided and denied defendant's motion.

At the conclusion of the second remand, the parties returned to this Court and submitted supplemental briefing. The matter is now ripe for resolution on appeal.

---

[3] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

## II. ANALYSIS

### A. SPEEDY TRIAL AND 180-DAY RULE

Defendant begins by arguing that he was denied his constitutional right to a speedy trial under US Const, Am VI; Const 1963, art 1, § 20, and, relatedly, that the trial court violated the "180-day rule" under MCL 780.131(1). "Whether defendant was denied the right to a speedy trial is a constitutional law question that is reviewed de novo." *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013). We review for clear error a trial court's factual findings. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. See *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993).

In line with our Constitutions, MCL 768.1 provides that those "charged with crime are entitled to and shall have a speedy trial." "Whether an accused's right to a speedy trial is violated depends on consideration of four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Rivera*, 301 Mich App at 193 (cleaned up). In this case, the parties agree that the delay between defendant's arraignment and his trial was just over 19 months. Prejudice is presumed when the delay is over 18 months, and the prosecutor then bears the burden of establishing that there was no injury. *Williams*, 475 Mich at 262. "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id.* (cleaned up).

In this case, defendant asserted the right to a speedy trial several times. The reasons for the 19-month delay, however, were largely attributable to COVID-19 restrictions. "[D]elays caused by the COVID-19 pandemic are not attributable to the prosecution when evaluating a speedy-trial claim." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 1. Further, some delays were the result of defendant's own requests, including the result in changes of defense counsel. Therefore, most, if not all, of the delay was not attributable to the prosecutor.

Moreover, there is no indication that defendant was prejudiced by the delay. Although the defendant claims that he was prejudiced because he "lost contact" with one of his witnesses during the delay, defendant has not demonstrated that the witness would have been beneficial to his defense. Defendant's argument that the delay also prejudiced him because the victim's memory was less reliable after the delay is also without merit because the victim's inability to provide more specific details does not harm defendant when the defense strategy included showing that the victim had a poor memory and was not credible.

Defendant additionally argues that he was personally prejudiced by his incarceration while he awaited trial. As the prosecutor argues, however, it appears that defendant would have been incarcerated for most, if not all, of the time as a result of charges in Montana and Genesee County. Although incarceration before trial results in a personal deprivation, "[p]rejudice to the defense is the more serious concern," *Williams*, 475 Mich at 264, and has not been established here.

Regarding the 180-day rule, MCL 780.131(1) requires the State to bring a defendant to trial within 180 days of the Department of Corrections giving notice of an untried complaint against an inmate of a correctional facility. Our Supreme Court held in *People v Lown*, 488 Mich 242, 270; 794 NW2d 9 (2011), that when "good-faith action was commenced within the 180-day period in order to ready the case for trial, the trial court is not deprived of jurisdiction although the trial itself is not commenced or completed within the period." Defendant admits that the prosecutor made a good-faith effort, and he instead challenges the holding in *Lown*. This Court, however, is bound to follow precedent of our Supreme Court. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 387-388; 741 NW2d 61 (2007). Thus, no relief on the issue is warranted.

## B. *BRADY* VIOLATION

Next, defendant argues that the prosecutor failed to disclose the forensic-interview videos. We review de novo a trial court's decision on a *Brady* claim. *People v Christian*, 510 Mich 52, 75; 987 NW2d 29 (2022). A *Brady* violation occurs when "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). The government has responsibility for evidence that is within its control even if the evidence is unknown to the prosecution and there was no bad faith. *Id*. at 150.

The circuit court did not clearly err by finding that the prosecutor provided the videos of the forensic interviews. Rettell, of the prosecutor's office, testified that she sent a thumb drive of evidence to the public defender's office and that the evidence included at least one video. Borino, of the public defender's office, testified that she received the thumb drive, which included videos of interviews. Witness credibility was for the circuit court to assess, not this Court. Moreover, the prosecutor provided documentation during the *Brady* hearing that confirmed that the discovery included the May and October forensic interviews. Hungerford even noted in a pretrial hearing that he wanted an expert to review the forensic interviews, which at least indicates his awareness of the interviews. Accordingly, the circuit court did not clearly err by concluding that the prosecutor had not suppressed evidence.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that he received ineffective assistance of counsel because trial counsel failed to review the videos of the forensic interviews; failed to consult an expert on child memory, suggestibility, and forensic interviewing; and failed to impeach the victim properly.

Defendant's right to counsel is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1 § 20. This right includes the right to the effective assistance of counsel. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). The circuit court's findings of fact made during a *Ginther* hearing are reviewed for clear error, and questions of constitutional law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

To establish a claim of ineffective assistance of counsel, defendant must show that: (1) defense counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007). Defense counsel's performance is deficient if it fell below an objective standard of professional reasonableness. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Defendant bears a heavy burden to show that counsel made errors so serious that counsel was not performing as guaranteed by the Sixth Amendment, and defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The performance prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. *Jordan*, 275 Mich App at 667.

First, the circuit court properly concluded that defense counsel performed below an objective standard of reasonableness by failing to review the forensic-interview videos. There was no reason not to review videos that included the victim's disclosures about the events for which defendant was convicted. Defendant argues that the failure to watch the videos prevented defense counsel from consulting and potentially calling an expert witness; rebutting the testimony that the forensic interviews were done correctly; and adequately impeaching the victim. Because the videos themselves were not offered as evidence and would have likely constituted inadmissible hearsay, see *People v Douglas*, 496 Mich 557, 576-577; 852 NW2d 587 (2014), the issue of whether defense counsel's failure to watch the videos prejudiced defendant depends on those remaining claims.

It was also, as defendant argues, objectively unreasonable for trial counsel not to consult with an expert. "In some cases, 'the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.' " *In re Casto*, 344 Mich App at 612-613, quoting *Hinton v Alabama*, 571 US 263, 273; 134 S Ct 1081; 188 L Ed 2d 1 (2014) (cleaned up). "Specifically with respect to child-sexual-abuse cases, the potential significance of expert testimony is well recognized." *Id.* at 613. This Court has held that "[e]ffective counsel, particularly an attorney practicing in areas involving child-sexual abuse, should be aware of the availability of experts in topics such as child memory, suggestibility, source misattribution, and forensic-interview protocols." *Id.* at 618. "While an attorney's selection of an expert witness may be a paradigmatic example of trial strategy, that is so only when it is made after thorough investigation of the law and facts in a case." *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015) (cleaned up). See also *People v Trakhtenberg*, 493 Mich 38, 54 n 9; 826 NW2d 136 (2012).

It is unclear in the record why defense counsel did not consult with an expert. The record shows that at one point, Hungerford *was* considering speaking with or calling an expert to testify, even after the circuit court denied his motion for the victim to be examined by a psychologist. Defendant's inclusion of an unnamed child psychologist on a witness list was even the basis for a prosecutor's motion to force defense counsel to specifically list the psychologist. Ultimately, however, defense counsel did not, according to the *Ginther* hearing testimony, consult with an expert. On this record, the failure to consult with an expert witness constituted deficient performance.

The next question is whether failing to watch the videos or consult with an expert prejudiced defendant. In *In re Casto*, 344 Mich App at 622, this Court noted that the Department

-11-

of Health and Human Services presented the testimony of several experts, resulting in "a one-sided presentation of experts." Here, although the prosecutor called several professionals to testify, the case ultimately rested on the victim's trial testimony because the victim testified, giving the jury the opportunity to assess the victim's statements and credibility. See *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). As the prosecutor argues on appeal, in *In re Casto*, 344 Mich App at 598-599, the trial court instead admitted and relied on the child's out-of-court statements at an adjudication trial.

Defendant argues that without a defense expert-witness, "the jury was led to believe that the complainant made a reliable disclosure in a neutral setting." Defendant points to several issues that Dr. Swerdlow-Freed identified in the interviews, but at trial, the forensic interviewer did not report any of the victim's statements. No expert specifically testified or implied that the victim was credible. Instead, the jury heard directly from the victim and also about the victim's unprompted statements made to Dr. Labian *prior* to the at-issue forensic interviews.

Although defendant alleges that the victim's foster mother coached her, there is no evidence in the record, or the forensic-interview videos, that this occurred, beyond the victim's statement at the preliminary examination that her foster mother told her "to tell" about defendant assaulting the victim and her siblings. The victim also testified that she had told the truth, that she did not lie about defendant, and that her foster mother told her to tell truth. Further, Dr. Swerdlow-Freed admitted that contradictions in the victim's interviews could indicate that defendant sexually assaulted the victim more than one time. The victim's rather sparse description at trial of the assaults likely aided defendant's defense, as opposed to her more explicit detailed descriptions during the interviews and preliminary examination. While there were some inconsistencies in these latter descriptions, the more graphic descriptions were not heard by jurors. Minimizing the details likely benefited the defense. Thus, trial counsel was able to argue at trial that the victim provided extremely limited details about the assaults, including not testifying about where the assaults happened.

As to using the interview statements for impeachment, given the victim's lack of memory about her preliminary-examination testimony, which occurred after the forensic interviews, it is unlikely that any impeachment on the basis of the interviews would have been helpful. It is clear from the trial transcript that the victim had limited memory of the events, and she easily became confused, but the jury still determined that it believed her statements that she was assaulted.

The evidence against defendant, including the victim's own testimony, does not establish a reasonable likelihood that having an expert testify about suggestibility or source attribution would have led to a different outcome. See *Jordan*, 275 Mich App at 667. The victim specifically testified at trial that defendant "stuck his penis in [her] butt" and mouth. The victim further testified that she saw defendant anally and orally assault her siblings. Dr. Labian testified that the victim engaged in unprompted sexual behavior during an office visit and made disclosures at that time. The victim acted out sexual positions and described abuse by defendant, including defendant urinating in her hair. The victim alleged that defendant put his penis into her mouth and told her to pretend that it was a "big strawberry." Put against this evidence, any evidence of a general nature that children are suggestible and sometimes have difficulty with source attribution would not have likely impacted the jury's analysis. Further, defendant and the victim's mother fled the state after his interview with police officers, and "[i]t is well established that evidence of flight is

admissible to show consciousness of guilt." See *People v Compeau*, 244 Mich App 595, 598; 625 NW2d 120 (2001). This is further evidence of guilt that would have been untouched by anything Dr. Swerdlow-Freed had to say at trial.

Finally, defendant argues that trial counsel "promised the jury that he would prove [the victim] was coached," but failed to establish that when cross-examining her, particularly by failing to use properly her statements from the preliminary examination. Defendant also argues that had trial counsel established that the victim had forgotten entirely about her earlier testimony, the preliminary-examination testimony could have been admitted. Preliminary-examination testimony may be used to impeach a witness's credibility, and defense counsel's introduction of preliminary-examination testimony may be a matter of effective assistance. See *Douglas*, 496 Mich at 588 n 12. Choosing to limit the examination of "a very young and sympathetic witness," however, in some situations, may be an objectively reasonable decision. See *id*.

Our Supreme Court has stated that "when a child attempts to testify but, because of her youth, is unable to do so because she lacks the mental ability to overcome her distress, the child has a then existing mental infirmity within the meaning of MRE 804(a)(4) and is therefore unavailable as a witness." *People v Duncan*, 494 Mich 713, 717; 835 NW2d 399 (2013) (cleaned up). Hungerford attempted to ask the victim about her preliminary-examination testimony, but she did not remember previously testifying. As defendant points out, the circuit court was forced to excuse the jury several times during cross-examination to address how counsel was addressing the victim, including using words that she did not understand.

Hungerford, however, effectively elicited information from the victim, including the victim's admission that she had problems remembering what happened more than a year earlier. Further, counsel asked the victim if she remembered testimony from the preliminary examination about practicing that testimony and that her foster mother told her to report that defendant had assaulted her. The victim testified that her foster mother had told her "some stuff." The victim's lack of memory was evident to the jury, and defense counsel explicitly addressed her lack of memory at trial.

Even if there was a deficiency in the cross-examination, defendant cannot satisfy the prejudice prong. It is possible that reading more from the preliminary-examination transcript would have confused the child witness. Further, there is no reasonable likelihood that the trial would have had a different outcome even had the victim's entire preliminary-examination testimony been introduced as substantive evidence to the jury when the victim testified at the preliminary examination that, although she had spoken with her foster mother about her testimony, her foster mother told her to tell the truth, and the victim claimed to tell the truth. At both the preliminary examination and trial, the victim testified that defendant had orally and anally penetrated her and her siblings. This consistency may have bolstered the prosecutor's case. See *Douglas*, 496 Mich at 588 n 12.

The jury also heard that an earlier investigation was closed after the victim failed to make disclosures during an interview. Trooper Pionk acknowledged that the victim, in her trial testimony, had changed or added to what she had shared in that initial interview. The jury, therefore, had direct evidence of some of the victim's inconsistency, in addition to what Hungerford elicited about the preliminary examination.

Finally, defense counsel was still able to argue that the victim's testimony was lacking any details of the assaults. As noted earlier, the victim's testimony during the preliminary examination was more vivid and detailed. While also sometimes inconsistent, the earlier testimony would have likely painted a more extensive picture of defendant's actions. Without that testimony, the jury was left with sparse testimony by an occasionally confused witness, and this fit in better with the defense strategy.

In sum, we recognize defense counsel provided deficient representation in several ways. There was no valid reason not to watch the forensic interviews or consult with an expert such as Dr. Swerdlow-Freed. Reviewing Hungerford's cross-examination of the child makes clear that he had scant experience in working with children in a courtroom setting. While recognizing this, our review of the record does not convince us that, but for counsel's errors, it is reasonably probable that the result of the trial would have been different.

## D. OTHER-ACTS EVIDENCE

Defendant argues that the circuit court impermissibly allowed the prosecutor to ask the victim about defendant sexually assaulting her siblings. Defendant recognizes, however, that our Supreme Court has held that other-acts evidence is admissible in sexual assault cases under MCL 768.27a, and he merely raises this issue in this Court to preserve it for further appellate review. Nevertheless, defendant argues that MCL 768.27a unconstitutionally infringes on his due-process rights. Although defendant objected to the evidence on the basis of its prejudicial effect, this constitutional error was not presented to the circuit court, and, thus, this Court reviews it for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To establish that relief is warranted under this standard, a defendant must show (1) that an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *Id*. at 763.

MCL 768.27a(1) states, in part, that when a defendant is accused of committing certain offenses against a minor, "evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." The prosecutor must "disclose the evidence to the defendant at least 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown." *Id*.

The prosecutor disclosed her intent to use the other-acts evidence in October 2020, approximately nine months before trial. Because the plain language of the statute allows the introduction of the other-acts evidence in this situation, the circuit court did not commit plain error by allowing the testimony.

## E. ACCOMMODATIONS

Next, defendant argues that he needed hearing accommodations so that he could understand the trial properly, and the trial court failed to provide any accommodation, in violation of the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*; the Rehabilitation Act of 1973, 29 USC 701 *et seq.*; and several constitutional amendments. Defendant did not raise this issue in the trial court. Therefore, we review for plain error. See *Carines*, 460 Mich at 763-764.

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 USC 12102(1). Defendant merely asserts that his hearing impairment qualified him as an individual with a disability, but he provided no documentation in the circuit court, or to this Court, to substantiate his claims. In one December 2020 hearing, defense counsel asked a witness "to speak up," and defendant mentioned his hearing loss and difficulty hearing over Zoom. In another hearing, the circuit court told defendant to inform the court if he needed anything repeated, but defendant never did. Moreover, defendant was physically present during trial, and the record indicates that defendant was able to understand counsels' questions without needing a hearing device. Although defendant asserts on appeal that he could not hear testimony at trial "that may have required his response," defendant has not identified to what in the transcript he would have differently responded. Therefore, defendant has not shown that the circuit court committed plain error regarding his ability to hear.

Defendant also appears to be making an ineffective-assistance-of-counsel argument in connection with this issue. But because defendant has not demonstrated that he could not hear at trial, defendant has not shown that counsel acted unreasonably by failing to pursue any accommodation.

## F. CONSECUTIVE SENTENCING

Finally, defendant argues that the circuit court impermissibly sentenced him to consecutive sentences. "[W]hen a statute grants a trial court discretion to impose a consecutive sentence, the trial court's decision to do so is reviewed for an abuse of discretion, i.e., whether the trial court's decision was outside the range of reasonable and principled outcomes." *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016). When exercising its discretion, the trial court must "articulate on the record the reasons for each consecutive sentence imposed." *Id*. Factual findings made at sentencing are reviewed for clear error. *People v Bowling*, 299 Mich App 552, 560; 830 NW2d 800 (2013).

Defendant was convicted of two counts of CSC-I, MCL 750.520b. MCL 750.520b(3) states that a "court may order a term of imprisonment imposed under this section to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." In *People v Bailey*, 310 Mich App 703, 725; 873 NW2d 855 (2015), this Court held "that an ongoing course of sexually abusive conduct involving episodes of assault does not in and of itself render the crimes part of the same transaction." Instead, multiple penetrations are considered to be part of the same transaction only when they are "part of a continuous time sequence." *Id*. (cleaned up). Accordingly, convictions for multiple penetrations, even occurring close in time and against the same victim, are not subject to consecutive sentencing unless the penetrations occurred as part of a continuous-time sequence. See *id*. at 724-725.

In this case, the victim's trial testimony did not establish that the penetrations occurred as part of a "continuous time sequence." The victim testified at the preliminary examination that there were multiple instances of anal penetration and that oral penetration occurred "[o]nce or twice." The victim did not, however, provide that the instances of penetration occurred as part of the same transaction. Although the victim testified that she thought the incidents occurred in the evening before she went to sleep, it is unclear from the record whether the instances occurred on

-15-

the same evening or on separate occasions. Therefore, there was not sufficient evidence in the record to conclude that the incidents occurred as part of a continuous-time sequence, and the circuit court erred by sentencing defendant to consecutive sentences.

Although defendant argues that this Court should remand the case to instruct the circuit court to enter his sentences as concurrent, resentencing is the proper remedy when a trial court commits error under MCL 750.520b(3). See *Bailey*, 310 Mich App at 726.

### III. CONCLUSION

Defendant's convictions are affirmed, but we vacate defendant's consecutive sentences and remand this matter to the circuit court for resentencing. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Brock A. Swartzle
/s/ Noah P. Hood