*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARRIN LENARDA THURMAN,

        Defendant-Appellant.

UNPUBLISHED
June 04, 2026
2:44 PM

No. 374554
Wayne Circuit Court
LC No. 24-004241-01-FH

Before: BAZZI, P.J., and RICK and MALDONADO, JJ.

PER CURIAM.

Defendant, Darrin Lenarda Thurman, appeals as of right his jury trial convictions of three counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(a) (sexual penetration of person at least 13 years of age and under 16 years of age), for which he was sentenced 5 to 15 years' incarceration for each conviction, to be served concurrently. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises out of Thurman's sexual abuse of then-13-year-old complainant, who is his sister's stepdaughter, on three different occasions. Complainant and her father resided in Melrose, Florida, between 2018 and 2022, after which they temporarily moved to San Antonio, Texas, for approximately a year to assist his wife, who is complainant's stepmother and Thurman's sister, with personal matters despite being separated. In June 2023, complainant's father, complainant's stepmother, complainant, and complainant's two half siblings relocated to Michigan because complainant's stepmother desired to see her extended family. Complainant and her family resided with Thurman's grandmother in her home in Detroit for approximately the entire month of June. During that time, Thurman and his child also stayed in the residence. Complainant's father testified that Thurman "had to move his room down to the basement because we [were] all— everybody else was staying upstairs." The basement contained two couches, a TV area, a bar that was approximately between 3 and 4 feet high, a laundry area behind the bar, and a bed where Thurman slept.

When complainant's father and complainant's stepmother would run errands, complainant "would be in the house upstairs with all the kids," while Thurman's grandmother generally stayed

in her bedroom or the kitchen to rest. Complainant's father explained, "Because I didn't really let [the children] in the basement unless somebody was down there to supervise them. I didn't trust them hanging out in the basement." Complainant's father further detailed, "We told [complainant] she shouldn't be going down in the basement, to stay upstairs, and that was basically it—no going outside unless somebody was out there with you." Complainant's stepmother instructed Thurman to watch the children in their absence, which was relatively often due to grocery runs.

One day, complainant, complainant's then-five-year-old sister, Thurman, and Thurman's son were in the basement of the residence of Thurman's grandmother. Complainant's sister and Thurman's son were playing with a toy car by the TV area, Thurman was seated on the couch playing a video game, and complainant was seated on the arm of the couch. Thurman directed complainant's sister to sit on his lap, which she complied with, before complainant's sister returned to play. Thurman then instructed complainant to sit on his lap, but because complaint was uncomfortable with his request, complainant sat on Thurman's knee, but Thurman repositioned complainant closer to his penis. Complainant testified, "And then he had told me to follow him towards where the steps were away from the kids. And that's when he put my hand in his pants. And he said, 'Don't tell nobody, or I will hurt you, and I will also get in trouble.' " Complainant was "scared and confused" because of Thurman's threat. Thurman then moved complainant to the laundry area positioned behind the bar, pulled his pants and underwear "halfway down," directed complainant to kneel, and put his penis in her mouth. Thurman remained standing, placed his hand on complainant's head, and "then moved it back and forth" until he ejaculated in her mouth. Complainant testified, "It tasted nasty enough for me to spit up—throw up my spaghetti into the sink next to the laundry area." Thurman reclothed himself and complainant went upstairs. Complainant believed that the laundry area was only a "little bit" visible from the TV area because of the bar. Complainant's father and stepmother were absent from the residence at that time, but Thurman's grandmother, complainant's half siblings, and Thurman's son were present in the home.

A few days after the first incident, complainant and Thurman were in the basement pursuant to Thurman's instruction, while complainant's sister, Thurman's son, and Thurman's grandmother were upstairs. While seated on the couch, Thurman directed complainant to remove her pants, squat over Thurman facing forward as Thurman's pants and underwear were "halfway down." Thurman then penetrated complainant vaginally, with Thurman "moving [complainant] back and forth" until Thurman pulled complainant off. Thurman cleaned himself with a nearby towel and complainant went upstairs.

After a couple of days, the third incident transpired when complainant was on the ground floor with her siblings and Thurman's son. Thurman emerged from the bathroom and directed complainant to follow him into complainant and her sister's temporary bedroom. The other children remained in the living room, and complainant could not recall where Thurman's grandmother was. While complainant and Thurman were alone in the bedroom, Thurman pulled his pants down and instructed complainant to do the same; neither party was wearing underwear. Complainant testified, "That's whenever he turned me around. My hands were, like, on the bed. And that's whenever I was bent down over the bed, and that's whenever he had put it in me." Complainant clarified that Thurman penetrated her vaginally with his penis, and he moved complainant back and forth with his hands until he ejaculated. Complainant recalled, "He stopped and grabbed whatever was close, and then I had went out." Regarding their relationship before

the sexual abuse with Thurman, complainant testified, "I mean, we was okay, like we was cool." Thurman allowed complainant to use his cellphone because her father and stepmother did not permit cellphone use at that time as a disciplinary measure. Complainant asserted that she did not immediately divulge what transpired because "I was scared, and I was kind of getting blackmailed" regarding the cellphone.

On June 30, 2024, complainant and her immediate family returned to Florida, and complainant's father expressed that complainant "wasn't functioning properly," and "she was getting into trouble more." Complainant's father expressed, "She started hanging around the wrong people, started getting—she got in a fight. And she wasn't able to explain herself well. She got worse with that. Then that was basically when I started learning." At that time, complainant disclosed what transpired to a friend and classmate. However, complainant expressed, "Because she thought that I was spreading things about her, and [complainant's friend] ended up telling everybody what I told her." A different friend advised complainant to inform her father of the sexual abuse, which led complainant to disclose the abuse to her father in December 2024 after he questioned her recent behavior. Complainant recalled, "I was very emotional because that was my first time after that incident actually going into details and stuff like that."

Concerning complainant's report of the abuse, her father stated:

I told her to be truthful and open, explain everything. Like, don't hide nothing. Like she was afraid of being in trouble. And I was like, you don't have to be in trouble—I mean, you don't have to worry about getting in trouble for the situation. You got to explain if somebody did something to you.

According to her father's testimony, complainant shared the following regarding the first assault:

Said she put his hand—[complainant] put her hands in [Thurman's] pants and he said if you told anybody, I'll get in trouble, and I'll hurt you.

And then they went into the laundry area, and that's when he told her to get on her knees. And he pulled his pants down and put his penis in her mouth, and she—told her to swallow it. So she said she threw up in the sink because she had spaghetti that day. That was the first allegation.

* * *

. . . [Complainant] told me that it started on the couch. They was—they was sitting on the couch, and [Thurman] told her to get closer. And then he told her to get on—sit—he told her to sit on her lap (sic), so she [sat] on . . . his knee. And then he pulled her closer, and then they got up. And that's when they moved forward—moved towards the steps.

Complainant's father did not believe that Thurman and complainant would be visible from the TV area if seated or kneeling. Regarding the second incident, complainant's father testified that complainant detailed, "The second time, they [were] upstairs. She said she was upstairs with the kids, and [Thurman] called her downstairs. And she came downstairs, and he told her to take her

-3-

pants off. He put her on top of her (sic) and penetrated her," and Thurman "moved her up and down." As to the third incident:

> [Complainant] said [Thurman] came out the bathroom, while they [were] upstairs, and [Thurman] called her to the room that she was sleeping in upstairs in the back, basically the furthest back to the left room. And he took off his pants, and she told—told her to take off her pants, and he bent her over and did the same thing.

Complainant's father clarified that "by the same thing," he meant that Thurman penetrated complainant. Complainant's father asserted that complainant was "doing the talking freely." While complainant testified that her father recorded their conversation, complainant's father denied doing so. Complainant's father recalled one incident during which complainant and Thurman were alone in the basement together stating, "[Complainant] was playing a game. She wanted to come down and get books and stuff like that. She was trying to hang out around [Thurman], and I was telling her, like, you don't be downstairs in the basement with a grown-up." Complainant's father had known Thurman or "D.J." since 2017, and their relationship was previously cordial.

After the disclosure, complainant's father accompanied complainant to the hospital for testing, and he contacted Children's Protective Services (CPS) and the Detroit Police. CPS subsequently conducted a forensic interview of complainant in Florida. Complainant testified that neither her father nor the CPS worker administering the interview instructed her regarding what to say, rather, they simply advised complainant to tell the truth. Corporal Ernine Gamble was assigned the matter after she received a report originating from the Florida Police Department, and she received a statement from complainant's father and reviewed complainant's forensic interview. The resulting investigative report detailed three incidents of sexual abuse, but only two involving ejaculations, and there was no mention of any of the assaults occurring on the ground floor of the residence of Thurman's grandmother. The acquired information was shared with the prosecution, and Thurman was charged.

Following a jury trial, Thurman was convicted and sentenced as previously stated. This appeal ensued.

## II. ANALYSIS

Thurman argues that he was denied effective assistance of counsel during the lower court proceedings. We disagree.

A claim of ineffective assistance of counsel is preserved "by moving in the trial court for a new trial or an evidentiary hearing," *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018), or by moving in this Court to remand for an evidentiary hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Because Thurman did not move in the trial court for a new trial or an evidentiary hearing, or move in this Court to remand for an evidentiary hearing, our review of these ineffective-assistance claims are limited to errors apparent on the record. *Id.*; *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

The United States Constitution and Michigan Constitution guarantee a defendant the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). We review for clear error a trial court's factual findings, and questions of constitutional law are reviewed de novo. *People v Shaw*, 315 Mich App 668, 671-672; 892 NW2d 15 (2016). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. The effective assistance of counsel is presumed, and the burden is on the defendant to establish the contrary. *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402 (2014). A defendant maintains the burden of establishing the factual predicate for an ineffective assistance of counsel claim. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

Decisions pertaining to what arguments to make, what evidence to present, and whether to call witnesses are matters of trial strategy, *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999), and counsel possesses wide discretion such matters, *Heft*, 299 Mich App at 80. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will this Court assess counsel's competence with the benefit of hindsight. *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019). However, while deference is given to counsel's strategic decisions, "a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citations omitted).

Thurman contends that his trial counsel neglected to consult key witnesses or conduct a proper investigation regarding the underlying allegations. Thurman specifically asserts that counsel should have solicited the testimonies of complainant's friend, complainant's stepmother, Thurman's grandmother, and an expert witness to challenge complainant's credibility. While Thurman asserts that the proposed witnesses' testimonies would have been exculpatory, he has not provided any witness affidavits, or identified any other evidence of record, indicating that these proposed witnesses were willing to testify at trial and what favorable testimony they would have provided. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) ("Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim."). Absent such a showing, Thurman cannot prove that he was prejudiced by defense counsel's failure to present these proposed witnesses. See *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018) ("Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial.").

Thurman then asserts that defense counsel did not adequately cross-examine complainant's father regarding the inconsistencies in his testimony. But having reviewed the record before us, counsel's questions, objections, remarks, and arguments throughout trial demonstrate that he was familiar with the case and had sufficiently challenged the prosecution's witnesses, including

complainant's father. Defense counsel contested the locations of the sexual abuse incidents, the nature of the assaults, the number of ejaculations, whether complainant's statement to her father had been recorded, and whether she had been coached or instructed regarding those statements. To the extent Thurman cites the fact that defense counsel's arguments were not successful, nothing in the record suggests that defense counsel's presentation of the defense was unreasonable or prejudicial. Again, counsel's decisions about how to argue the evidence are matters of trial strategy, *Rockey*, 237 Mich App 74, which we will not assess with the benefit of hindsight, *Traver (On Remand)*, 328 Mich App at 422-423. The fact that defense counsel's defense strategy may not have worked does not constitute ineffective assistance of counsel. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

Thurman likens his matter to *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012), but his reliance is misplaced. In *Trakhtenberg*, 493 Mich at 43, the defendant "was charged with five counts of second-degree criminal sexual conduct (CSC–II) for allegedly touching the genitals of his eight-year-old daughter and forcing her to touch his genitals." The Michigan Supreme Court determined that the defendant was deprived of effective assistance of counsel because his trial counsel: (1) encouraged the defendant to waive his preliminary examination, leaving counsel without any information going into trial on the factual predicates of each of the charges and the prosecution's theory of guilt; (2) neglected to interview key witnesses, which would have provided counsel with critical context to presenting a defense, including the fact that the complainant's mother had animosity toward the defendant over divorce proceedings; and (3) defense counsel testified that, if she had discovered the pertinent information, she would have significantly altered her trial strategy. *Id*. at 52-55. The Court resolved "defense counsel's performance was constitutionally deficient because a sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id*. at 55.

Unlike *Trakhtenberg*, in the present case, it was evident defense counsel investigated and prepared for the underlying matter, as demonstrated by his formulation of a defense addressing complainant's forensic interview, the police department's investigative report, and the specific details of complainant's sexual abuse allegations. Moreover, Thurman fails to indicate what information defense counsel should have uncovered through investigation that would have strengthened his defense at trial. Thurman then points to the following statement in *Trakhtenberg*: "[G]iven the exposure the complainant had to multiple interviews and leading questions, a reasonable attorney would have consulted an expert . . . to testify regarding the propriety of how the complainant made her allegations." *Id*. at 54. But in the instant matter, complainant was only subject to one forensic interview, and she testified that she felt comfortable disclosing the sexual abuse without significant prompting from the CPS worker. Further, there was no indication that any of complainant's family members harbored any previous negative feelings toward Thurman, rather, both complainant and her father testified that their prior relationship was cordial. Stated alternatively, there was no evidence that anyone held any animus toward Thurman, let alone of any such person having an opportunity to influence complainant. Lastly, in *Trakhtenberg*, the Court concluded the defendant was prejudiced because there were several avenues that counsel could have pursued, each of which would have tipped the scales of credibility in favor of the defendant, and those omissions were serious enough to undermine confidence in the jury's verdict. *Id*. at 58. However, in the present case, given the overall consistency of the testimonies of complainant and her father regarding the subject sexual abuse incidents, and Thurman's failure to

indicate what further evidence would have adequately challenged their statements, Thurman cannot demonstrate the same. Ultimately, Thurman has not shown he is entitled to relief on an ineffective-assistance basis.

Affirmed.

/s/ Mariam S. Bazzi
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado